*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JOHN DERECK MAHL,

Defendant-Appellant.

UNPUBLISHED
December 05, 2025
10:18 AM

No. 364897
Shiawassee Circuit Court
LC No. 2022-007116-FC

Before: GADOLA, C.J., and BOONSTRA and SWARTZLE, JJ.

PER CURIAM.

Defendant, John Dereck Mahl, was convicted after a jury trial of two counts of first-degree criminal sexual conduct (CSC I), MCL 750.520b(1)(c), first-degree home invasion, MCL 750.110a(2), and larceny from a building, MCL 750.360. Defendant was sentenced to 210 to 630 months in prison for each CSC I conviction, 140 to 240 months for the home invasion conviction, and 17 to 48 months for the larceny conviction. One of the sentences for CSC I is to be served consecutively to the sentence for home invasion, with the other sentences to be served concurrently. Defendant appeals, challenging his convictions and sentences. We vacate defendant's convictions and sentences and remand to the trial court for a new trial.

## I. FACTS

This appeal arises from defendant's alleged sexual assault of his then-girlfriend early in the morning of September 27, 2021. Defendant and Melissa Huntoon met in November 2020; they began a relationship, and in January 2021, defendant moved into Huntoon's home. Huntoon testified that during the relationship, she gave defendant access to the keys to her home, including leaving a key for him on the back porch so that he could enter the house.

On August 22, 2021, Huntoon asked defendant to move out; defendant returned a house key to Huntoon and left after the police directed him to leave. Defendant left his truck in Huntoon's driveway because it would not start, and some of defendant's belongings were still in Huntoon's home. Huntoon testified that after that date, she no longer left a key on the back porch, but she did not know whether defendant still had a key to her house. The couple continued to have

-1-

a consensual sexual relationship, defendant visited Huntoon at her house with her permission, and the couple texted daily.

On September 25, 2021, Huntoon and defendant exchanged text messages throughout the day, and Huntoon invited defendant to her home that evening. According to defendant, when he arrived at Huntoon's house the door was locked and Huntoon did not answer the door. He testified that he left, but Huntoon called him and asked him to come back, explaining that she had been asleep. Defendant returned to Huntoon's house and Huntoon let him in. Defendant testified that she then gave him keys to her house and told him he could use the keys to enter the house "whenever."

Huntoon testified that on several occasions during the relationship defendant made videos with his phone while the couple engaged in sexual acts. Huntoon testified that when defendant arrived at her home on September 25, 2021, she and defendant argued, then had consensual sex in the shower, which defendant video recorded with Huntoon's phone, then argued again because defendant accused Huntoon of having sex with her former boyfriend. Before leaving, defendant threw Huntoon's cell phone into the toilet, thereby destroying the phone.

Huntoon bought a new cell phone that night. The next day, September 26, 2021, the couple continued texting. Huntoon testified that defendant's messages suggested he was suicidal,[1] so to cheer him up, she texted and called him, asking him if he wanted to meet to "talk" or to "grab a bite to eat." According to Huntoon, she did not invite defendant to her home, but the couple's texting was flirtatious and sexually suggestive.

Later that evening, Huntoon called defendant and the couple had a short phone conversation; defendant testified that during the phone call Huntoon invited him to her home, and specifically asked him to "f*** her brains out, and cuddle." Huntoon testified that although she may have wanted him to come to her home that evening, she did not invite him. The couple continued to text, with defendant asking Huntoon to have sex with him, and Huntoon telling defendant that she was cold and wanted to be held, but also telling him that she was tired. Huntoon also told defendant that she had watched a video of the two of them engaged in sex and that it "turned [her] on." The couple exchanged goodnights by text, and defendant continued to ask Huntoon to have sex with him; Huntoon did not respond to his suggestions, but sent him a picture of her legs in bed, which she later testified was to indicate to defendant that she was falling asleep. Huntoon testified that she fell asleep after midnight with her phone on her bed.

Defendant testified that after Huntoon invited him to her house, he drove to the store for cigarettes, then stopped at a friend's house before arriving at Huntoon's house at approximately midnight to 12:30 a.m. He testified that he used the keys that Huntoon had given him the day before to let himself in the side door of the house. He testified that when he entered Huntoon's bedroom, she was sitting up in bed and appeared to be awake. Defendant testified that he greeted her as he stood in the doorway, and she said that she was glad that he had come over. He testified

---

[1] Defendant testified that his mother died a few days before these events, and he was feeling depressed.

that she then approached him, they began kissing, and she then performed penile-oral sex on him. He then took off her clothes and performed oral sex on her. According to defendant, Huntoon then got on top of him on the bed and they engaged in penile-vaginal sex. He testified that at no time during this interaction did Huntoon object, ask him to stop, or physically react in a manner to indicate that she objected.

He testified that eventually he fell asleep, but woke up a few minutes later when Huntoon threw a phone at his face. He testified that she was angry because she had looked at his phone and had seen messages from other women. When he realized that there was going to be an argument, he grabbed his clothes from the dresser, unintentionally also grabbed her phone, and fled the house. He testified that he realized later that he had her phone. When he later was called by the police, he willingly gave Huntoon's keys to the officer. Initially, he told the officer that he did not take Huntoon's phone, but later admitted that he had her phone, and about one year later he gave Huntoon's phone to the police.

In contrast to defendant's testimony, Huntoon testified that early in the morning on September 27, 2021, she woke up to find defendant on top of her, naked, and trying to kiss her. She testified that she asked defendant what he was doing there and how he got in, and he told her that the door was unlocked. She testified that she was confused, and that against her will defendant took off her top, then went to the side of the bed, stated that he thought this was what she wanted, then put his penis in her mouth. According to Huntoon, defendant then pulled off her pants, pinned her, and performed oral sex on her though she told him to stop. While searching for her phone, she grabbed defendant's shorts that were on the bed. When she did so, defendant grabbed the shorts from her and ran from the home, apparently taking her cell phone with him.

Huntoon's Ring doorbell recorded defendant entering the home at 12:24 a.m. on September 27, 2021, and running from the home 18 minutes later chased by a naked Huntoon who was screaming and calling for help. Huntoon testified that she could not locate her phone, so she first knocked on a neighbor's door, then drove to a friend's home from where she called the police. The tracking software on Huntoon's phone indicated that on the morning of September 27, 2021, her phone traveled from her home around the time of the couple's sexual activity to the place where defendant was staying with a friend. Shortly thereafter, her phone was used to send sexually explicit videos of Huntoon and defendant to other people.

Karl Sahlke, Huntoon's neighbor, testified that between 12:30 a.m. and 12:45 a.m. on September 27, 2021, the security cameras mounted on his home recorded Huntoon knocking on his front door while appearing to be distraught, then leaving after 30 seconds.

Shawn Green, Huntoon's friend, testified that early in the morning on September 27, 2021, Huntoon pounded on her bedroom window and was very distraught. She testified that Huntoon told her that defendant had somehow entered her home and she had awoken to find him on top of her in bed, that he forced himself on her, and that she could not find her cell phone. Green called the police. After Huntoon spoke with police, Green drove Huntoon to various retail stores to buy a phone and new locks for her home, then drove Huntoon to Huntoon's mother's home. Green testified that while Huntoon and defendant were living together, Huntoon had given defendant a

-3-

key to Huntoon's house; when defendant lost the key, Huntoon thereafter left a key on the back porch for defendant to use to enter the home.

Officer Joseph Orr, a police officer with the City of Durand, testified that he responded to Huntoon's call to the police on the morning of September 27, 2021, at 1:05 a.m. He testified that she appeared very upset and was crying, and reported that she had been sexually assaulted by her ex-boyfriend whom she identified as defendant. He testified that he investigated Huntoon's home and found no sign of forced entry into the home. Orr's testimony regarding Huntoon's description of the events of that morning was similar to Huntoon's testimony at trial. One discrepancy, however, was that Orr testified that Huntoon told him that after she and defendant had sex, she went into the bathroom, at which time defendant ran out the front door. When she realized that he was leaving, she followed him out the front door screaming.

Orr testified that he contacted defendant by telephone, and defendant agreed to meet with Orr at the police station on September 29, 2021. Orr testified regarding defendant's description of the events of September 26-27, 2021, which was essentially consistent with defendant's testimony at trial. Orr testified that he again was present during an interview of defendant on September 13, 2022, by Michigan State Police, during which defendant admitted that he took Huntoon's phone for the purpose of embarrassing Huntoon with the videos.

Detective Sergeant Joseph Vandermuelen with the Michigan State Police testified that he interviewed defendant on September 13, 2022, at which time defendant told him that in the early morning of September 27, 2021, he was at Huntoon's home and took her phone while she was in the bathroom, and later accessed information in the phone and contacted her employer and coworkers.

Jeremy Hanuscak, Huntoon's former boyfriend, testified that at 1:30 a.m. on September 27, 2021, he received messages from Huntoon's phone that included sexually explicit videos of Huntoon performing oral sex on someone, and then someone performing oral sex on Huntoon, then another video showing Huntoon having penile-vaginal sex with someone. He testified that in the videos Huntoon appeared to be a willing participant. Scott Lorts, Huntoon's friend, testified that he received a message from Huntoon's phone at 1:00 a.m. on September 27, 2021, containing a video of Huntoon having sexual intercourse with someone.

Holly Rosen, a social worker employed by MSU Safe Place at Michigan State University, a campus domestic violence program, testified for the prosecution as an expert witness and was qualified by the trial court to testify regarding nonintuitive victim responses, perpetrator tactics, domestic and sexual assault, and the neurobiology of trauma. The prosecution also called as witnesses Deanna Cousins and Trina Rice, defendant's ex-girlfriends, and Janae Woodward, defendant's ex-wife; the three witnesses testified regarding defendant's behavior toward them during their respective relationships.

Defendant was convicted following a jury trial of two counts of first-degree criminal sexual conduct, first-degree home invasion, and larceny from a building. Defendant was found not guilty of three counts of intentional dissemination of sexual material, MCL 750.145e. After sentencing,

defendant moved for a new trial, or alternatively an evidentiary hearing, asserting a *Brady*[2] violation as well as ineffective assistance of counsel. The trial court struck defendant's motion for new trial as untimely,[3] and struck defendant's brief in support of the motion for exceeding the page limitation of MCR 2.119(A)(2)(a). The trial court permitted defendant to refile his motion for new trial subject to the page limitation set forth in the trial court's order, and ordered defendant also to file a separate brief addressing the question of the timeliness of the motion if defendant chose to refile the motion. Defendant did not refile his motion for new trial with the trial court.

Defendant sought remand in this Court, which this Court denied without prejudice to this Court later determining that remand is necessary.[4] Defendant now appeals.

## II. DISCUSSION

### A. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant contends that he was denied the effective assistance of counsel because defense counsel at trial (a) failed timely to move to suppress the admission of irrelevant and unfairly prejudicial other acts evidence under MCL 768.27b and MRE 404(b); (b) failed to object to impermissible vouching testimony from expert Holly Rosen; (c) failed to investigate and timely file a witness list and exhibit list; and (d) failed to request a mistake of fact instruction. We agree that defense counsel at trial was ineffective.

Whether a defendant has been denied the effective assistance of counsel is a mixed question of fact and constitutional law. *People v Yeager*, 511 Mich 478, 487; 999 NW2d 490 (2023). Ordinarily, this Court reviews the trial court's findings of fact for clear error, while reviewing rulings of constitutional law de novo. *Id*. In this case, however, although defendant preserved his challenge to the effectiveness of his representation at trial by moving for a new trial or evidentiary

---

[2] *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

[3] The trial court appears to have incorrectly concluded that defendant's motion for new trial was not timely. Under MCR 7.208(B)(1), defendant's motion for new trial was required to be filed within the time for filing defendant's brief on appeal with this Court. Because this Court granted several extensions of time to defendant for the filing of his brief on appeal, the time for filing the motion for new trial also was extended. See MCR 7.208(B)(1), MCR 7.212(A)(1)(a)(*iii*).

[4] *People v Mahl*, unpublished order of the Court of Appeals, entered May 28, 2024 (Docket No. 364897); *People v Mahl*, unpublished order of the Court of Appeals, entered October 23, 2025 (Docket No. 364897).

hearing,[5] because no *Ginther*[6] hearing was held, the trial court did not make findings or rulings on the substantive issues of the motion, and this Court's review therefore is limited to mistakes apparent on the record. See *People v Miller*, 326 Mich App 719, 726; 929 NW2d 821 (2019).

The United States and Michigan Constitutions guarantee a defendant's right to a fair trial, US Const, Am VI; Const 1963, art 1, § 17, which includes the right to the effective assistance of counsel, *Yeager*, 511 Mich at 488. To establish a claim of ineffective assistance of counsel, a defendant must show that counsel's performance fell below an objective standard of reasonableness, and that but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different. *Id*. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*., quoting *Strickland v Washington*, 466 US 668, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

In addition, to establish ineffective assistance of counsel, the defendant must establish the factual predicate for the claim. *People v Douglas*, 496 Mich 557, 592; 852 NW2d 587 (2014). To do so, the defendant must overcome the strong presumption that counsel's performance arose from sound trial strategy. *People v Cooper*, 309 Mich App 74, 80; 867 NW2d 452 (2015). Counsel is not ineffective merely because a trial strategy was unsuccessful. *People v White*, 331 Mich App 144, 149; 951 NW2d 106 (2020). The effective assistance of counsel is presumed, and the defendant bears the burden of proving that counsel was ineffective. *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018).

### 1. OTHER ACTS EVIDENCE

Defendant argues that he was denied the effective assistance of counsel because defense counsel failed timely to move to suppress the admission of the testimony of Deanna Cousins, Trina Rice, and Janae Woodward. The trial court admitted the testimony of Cousins and Rice under MCL 768.27b, while admitting the testimony of Woodward under MRE 404b.

The admission of other-acts evidence generally is governed by MRE 404(b), which largely bars the admission of propensity evidence. The prohibition against character evidence introduced to prove a defendant's propensity to act in accordance with that character is based on the

---

[5] The prosecution argues that this issue is unpreserved because defendant failed to refile his motion for new trial after the trial court struck defendant's motion and supporting brief, and thereby deprived the trial court of the opportunity to consider his claims. Defendant's motion for new trial appears to have been timely filed with the trial court, thereby preserving this issue for appeal, though the motion was struck by the trial court as untimely. See *People v Wilson*, 242 Mich App 350, 352; 619 NW2d 413 (2000). Defendant did not take the opportunity offered by the trial court to refile the motion, and thereby explain that the motion was timely. That being said, defendant's brief submitted to the trial court in support of the motion for new trial was thorough, so the trial court was not deprived of the briefing necessary to consider defendant's motion had the trial court wished to do so.

[6] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

presumption of innocence. *People v Crawford*, 458 Mich 376, 383-384; 582 NW2d 785 (1998). "Underlying the rule is the fear that the jury will convict the defendant inferentially on the basis of his bad character rather than because he is guilty beyond a reasonable doubt of the crime charged." *Id*. at 384. At the time of defendant's trial,[7] MRE 404(b) provided in part:

> (1) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, where such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

However, "MCL 768.27b is an exception to the general bar against propensity evidence in MRE 404(b)." *People v Wade*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket 369106); slip op at 10. By enacting MCL 768.27b, the Legislature determined to permit the admission of propensity evidence in cases involving domestic violence or sexual assault despite the bar to such evidence contained in MRE 404(b). See *People v Watkins*, 491 Mich 450, 471; 818 NW2d 296 (2012) (discussing MCL 768.27a); *People v Cameron*, 291 Mich App 599, 610; 806 NW2d 371 (2011). This Court has reasoned that "prior-bad-acts evidence of domestic violence can be admitted at trial because a full and complete picture of a defendant's history tend[s] to shed light on the likelihood that a given crime was committed."[8] *Id*. (quotation marks and citation omitted). At the time of defendant's trial in this case, MCL 768.27b[9] provided, in relevant part:

> (1) Except as provided in subsection (4), in a criminal action in which the defendant is accused of an offense involving domestic violence or sexual assault, evidence of the defendant's commission of other acts of domestic violence or sexual assault is admissible for any purpose for which it is relevant, if it is not otherwise excluded under Michigan rule of evidence 403.

* * *

---

[7] MRE 404(b) was amended September 20, 2023, effective January 1, 2024. This opinion refers to the version of the court rules in effect at the time of defendant's trial in this case.

[8] In other words, propensity evidence is helpful because criminals tend to commit crimes. But of course, the reason that propensity evidence generally is inadmissible is not because it is irrelevant, but rather because it is so very relevant that it may "weigh too much with the jury and . . . so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." *Watkins*, 491 Mich at 468-469.

[9] MCL 768.27b was amended by 2024 PA 184, effective April 2, 2025. This opinion refers to the version of the statute in effect at the time of defendant's trial. See MCL 768.27b, as amended by 2018 PA 372.

(4) Evidence of an act occurring more than 10 years before the charged offense is inadmissible under this section unless the court determines that 1 or more of the following apply:

(a) The act was a sexual assault that was reported to law enforcement within 5 years of the date of the sexual assault.

(b) The act was a sexual assault and the sexual assault evidence kit was collected.

(c) The act was a sexual assault and the testing of evidence connected to the assault resulted in a DNA identification profile that is associated with the defendant.

(d) Admitting the evidence is in the interest of justice.

Thus, "in prosecutions for offenses involving domestic violence or sexual assault, MCL 768.27b permits evidence of a defendant's prior commission of domestic violence or sexual assault to show the defendant's character or propensity to commit such acts." *People v Berklund*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 367568); slip op at 8. The evidence generally is admissible under MCL 768.27b if the admission of the evidence does not violate MRE 403 and took place no more than 10 years before the charged offense. "The prior act does not have to be identical to the charged offense to be relevant and possibly admissible under MCL 768.27b." *Berklund*, ___ Mich App at ___; slip op at 9. MCL 768.27b(6) provides the following definitions:

(6) As used in this section:

(a) "Domestic violence" or "offense involving domestic violence" means an occurrence of 1 or more of the following acts by a person that is not an act of self-defense:

(*i*) Causing or attempting to cause physical or mental harm to a family or household member.

(*ii*) Placing a family or household member in fear of physical or mental harm.

(*iii*) Causing or attempting to cause a family or household member to engage in involuntary sexual activity by force, threat of force, or duress.

(*iv*) Engaging in activity toward a family or household member that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested.

(b) "Family or household member" means any of the following:

(*i*) A spouse or former spouse.

(*ii*) An individual with whom the person resides or has resided.

(*iii*) An individual with whom the person has or has had a child in common.

(*iv*) An individual with whom the person has or has had a dating relationship. As used in this subparagraph, "dating relationship" means frequent, intimate associations primarily characterized by the expectation of affectional involvement. This term does not include a casual relationship or an ordinary fraternization between 2 individuals in a business or social context.

(c) "Sexual assault" means a listed offense as that term is defined in section 2 of the sex offenders registration act, 1994 PA 295, MCL 28.722.

The statute applies if the defendant's past conduct and current charge both fall within these definitions. *Wade*, ___ Mich App at ___ ; slip op at 10. At the time of trial in this case, MCL 28.722[10] defined "listed offense" as "a tier I, tier II, or tier III offense." A violation of MCL 750.520b is a tier III offense, unless the trial court determines that the victim consented to the conduct constituting the violation. MCL 28.722(v)(*iv*). In this case, the record does not indicate that the trial court found that Huntoon consented to the conduct of the alleged CSC I. The alleged conduct therefore was a "sexual assault" for purposes of MCL 768.27b. The alleged conduct also meets the definition of domestic violence under MCL 768.27b(6)(a)(*iv*) because the charges of CSC I allege facts that suggest defendant engaged in activity toward a person with whom he had a dating relationship, MCL 768.27b(6)(b)(*iv*), "that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested." Defendant's alleged past conduct described by the witnesses in this case also met the definition of domestic violence.

Other-acts evidence under MCL 768.27b, however, is admissible only "for any purpose for which it is relevant." At the time of trial in this case, MRE 401[11] provided that " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Thus, all evidence admitted under MCL 768.27b must be probative. *People v Rosa*, 322 Mich App 726, 733; 913 NW2d 392 (2018).

In addition to the requirement of relevance, the admission of other-acts evidence under MCL 768.27b, even if relevant, remains subject to MRE 403. At the time of defendant's trial, MRE 403[12] provided:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

"Unfair prejudice" under MRE 403 does not arise simply because the evidence is damaging to the defendant, *People v Thurmond*, 348 Mich App 715, 730; 20 NW3d 311 (2023), but rather

---

[10] MCL 28.722 was amended by 2024 PA 66, effective October 6, 2024. This opinion refers to the version of the statute in effect at the time of defendant's trial.

[11] MRE 401 was amended September 20, 2023, effective January 1, 2024.

[12] MRE 403 was amended September 20, 2023, effective January 1, 2024.

exists "where there is danger that the evidence will be given undue or preemptive weight by the jury or where it would be inequitable to allow use of the evidence," *People v Blackson*, 481 Mich 451, 462; 751 NW2d 408 (2008). When considering whether MRE 403 bars evidence admissible under MCL 768.27b, the court should weigh the propensity inference in favor of the probative value of the evidence rather than the prejudicial effect. See *Watkins*, 491 Mich at 487 (referring to MCL 768.27a). In doing so, the court considers "(1) the dissimilarity between the other acts and the charged crime, (2) the temporal proximity of the other acts to the charged crime, (3) the infrequency of the other acts, (4) the presence of intervening acts, (5) the lack of reliability of the evidence supporting the occurrence of the other acts, and (6) the lack of need for evidence beyond the complainant's and the defendant's testimony. *Watkins*, 491 Mich at 487-488.

Evidence admissible as a prior act of domestic violence generally must have taken place less than 10 years before the charged incident. MCL 768.27b(1); *Rosa*, 322 Mich App at 732-733. Although an exception exists that permits the admission of older evidence of domestic violence when the trial court determines that admitting the evidence is in the interests of justice, MCL 768.27b(4), the exception is narrowly construed and such evidence is admissible only "if the evidence is uniquely probative or if the jury is likely to be misled without admission of the evidence." *Rosa*, 322 Mich App at 734.

In this case, defendant was charged with two counts of first-degree criminal sexual conduct, under MCL 750.520b(1)(c). Because those charges involved a listed offense as defined in the sex offenders registration act, see MCL 28.722, defendant is accused of a crime involving sexual assault as that term is used in MCL 768.27b(1). In addition, the charges involved conduct that meets the definition of domestic violence under MCL 768.27b. Therefore, under MCL 768.27b, evidence of defendant's "commission of other acts of domestic violence or sexual assault is admissible for any purpose for which it is relevant, if it is not otherwise excluded under [MRE] 403."

Deanna Cousins testified that she dated defendant "on and off" for about one year starting in 2019 and ending in January 2020. She testified that during the relationship, they would fight every two to three months because defendant would become jealous, and that she "would end up bruised in some way." Cousins testified that while defendant was at her home at the end of January 2020, defendant accused her of infidelity and threw her phone at her, hitting her in the face and causing her lip to bleed. She testified that after they quarreled further, defendant grabbed her phone from her, and that he also had her car keys. When she attempted to grab defendant's phone from him, he tackled her to the ground, then pushed her across the room when she stood up. He then pointed a rifle at her with the rifle still in its case, and told her "maybe we should finish this now." She described that she ran from defendant, but he followed her, knocking Cousins against the wall, then pulled her across the room by her hair. She eventually retrieved her car keys, then left the house and called the police. She testified that he previously had taken her phone and earlier had broken her previous phone. Cousins testified, however, that defendant never forced her to have sex and that every time they had sex together it was consensual.

Cousins also testified that during an earlier fight in her garage, defendant backed his truck up while her knee was caught in the door of the truck. She testified that on that occasion, she had told him that he could retrieve his property from the garage, and that while doing so, he walked into the house without her permission. She also testified that once they traveled to Cheboygan to

drop his children at his ex-wife's home; when they smelled marijuana at the home, defendant asked his ex-wife for some. At that point in her testimony, defense counsel objected and the trial court instructed the jury to disregard Cousins' testimony about the fight in the garage and the trip to Cheboygan. The trial court denied defense counsel's request that the trial court instruct the jury, who were taking notes, to cross out the notes regarding that portion of Cousins' testimony.

Trina Rice testified that she dated defendant from 2013 to 2015. She testified that the relationship was good for about six months, until he lost his housing and moved in with her. After that, he became very jealous and suspicious of her. She testified that in December 2014, he stole money and tools from her, and also stole Christmas gifts intended for her children and his children. She testified that during the relationship, defendant accused her of having sex with the father of one of her children's teammates, took her car keys to prevent her from attending her son's wrestling match, and pushed her while they quarreled. She testified that one time when she was struggling to retrieve her keys from defendant he fractured her finger.

Janae Woodward testified that she had a relationship with defendant for four years from 2000 to 2004, and during that time they were married for about one year. Woodward testified that in December 2004, she ended the relationship and told him to leave, at which time he became violent and got a gun and threatened to kill her. She testified that when she attempted to call the police, he took her phone and broke it. Woodward testified that in July 2005, defendant used his car to block her car, then jumped in her car with her, argued with her, struck her, threw pop on her, and took her phone and the keys from her ignition before leaving. She testified that in January 2007, defendant tried to enter her house where she was entertaining family and friends, and slashed the tires of all the cars in her driveway.

Before trial, the prosecution filed a notice of intent to introduce the testimony of Cousins and Rice under MCL 768.27b, and a notice of intent to introduce Woodward's testimony under MRE 404(b). Defendant objected to the admission of the evidence by filing written objections with the trial court the day before the start of trial. The trial court struck defendant's objections from the record because the filings were not timely, cogent, or signed by defense counsel. The trial court stated in pertinent part:

> At approximately 2:30 yesterday afternoon [December 12, 2022] chambers received four purported filings by defense counsel, and I say purported because none of the documents were signed. Shortly before five o'clock, the court entered an order striking those documents, although they remained in the physical file for appellate review. They included a witness list, an exhibit list, and two objections relating to other acts evidence.

> The Court was first made aware of the possibility of objections at a hearing on December 8th of the year 2022. At the time, the Court was assured that the defense would be filing those documents at the end of that day, that was December 8th. That didn't happen.

* * *

Turning now to the objections, the Court has a number of problems with those filings. They're all in caps. They largely omit punctuation. They're littered with typographical errors and the arguments are barely comprehensible. They lack any meaningful citation to authority and lack any analysis of the issues involved. The arguments contained in those objections are abandoned because they have not been briefed. That's in addition to the late filing, which again, left the People and the Court, with functionally no time to address their contents.

Other acts [] evidence is one of the most complex [fact-sensitive] areas a circuit court judge can encounter in regular practice. It requires thoughtful consideration of the proposed evidence, the reasons . . . offered for its admission, and the weighing of [probative] value against the risk of undue prejudice.

The objection under MRE 404b, does not address this test at all. The People filed the supplement to their 404b notice back on October 11 of the year 2022, that's more than 14 days before trial so it's timely filed. In fact, that's more than 60 days before trial so there's no reason the objection wasn't timely filed. The Court struggled to find a cogent argument in defendant's purported objection. Counsel['s filing] argues, without authority, that any other act, more than 10 years old, should be precluded. Certainly temporal proximity is a factor to be considered under 404b, but it doesn't establish a per se rule based on the age of evidence. Defendant's position appears to be that 404b evidence relating to defendant's ex-wife is irrelevant, but that argument isn't clearly stated.

The Court finds that the People have alleged non-propensity purposes for introducing the evidence. The Court finds that the evidence is relevant for these non-propensity reasons. The Court finds that the danger of unfair prejudice does not outweigh their probative value. The evidence will be admitted.

* * *

In summary, defendant's objections are overruled because defense counsel abandoned the issues presented there and by failing to brief them. They also are overruled on whatever merits they can be said to possess.

A review of the record demonstrates that a large portion of the testimony of the three witnesses was not relevant to prove the sexual assault offenses with which defendant was charged. Defendant was charged with two counts of first-degree CSC under MCL 750.520b(1)(c), which provides:

(1) A person is guilty of criminal sexual conduct in the first degree if he or she engages in sexual penetration with another person and if any of the following circumstances exist:

* * *

(c) Sexual penetration occurs under circumstances involving the commission of any other felony.

This theory of CSC I has only two elements, which are (1) sexual penetration (2) that occurs under circumstances involving the commission of another felony. *People v Wilkens*, 267 Mich App 728, 737; 705 NW2d 728 (2005). Under this statutory section, the prosecution is not required to prove that the sexual penetration was unconsented; as a result, consent is not a defense to the first element of this statutory section, though consent may be a defense to the underlying felony. *People v Waltonen*, 272 Mich App 678, 689-690; 728 NW2d 881 (2006).

In this case, both defendant and Huntoon testified that at least two sexual penetrations occurred during their encounter in the early morning of September 27, 2021. This element of both counts of CSC I was clearly demonstrated without the testimony of Cousins, Rice, or Woodward. Moreover, none of the witnesses testified regarding the element of sexual penetration, except that Cousins testified that she never had nonconsensual sex with defendant. The testimony of these witnesses was neither relevant nor necessary to prove this element of CSC I.

The second element that the prosecution was required to prove to convict defendant of each charge of CSC I was that the sexual penetration "occur[ed] under circumstances involving the commission of any other felony." MCL 750.520b(1)(c). Defendant was charged with committing first-degree home invasion and larceny from a building, which the prosecution alleged satisfied the second element of CSC I. With regard to first-degree home invasion, MCL 750.110a(2) provides:

(2) A person who breaks and enters a dwelling with intent to commit a felony, larceny, or assault in the dwelling, a person who enters a dwelling without permission with intent to commit a felony, larceny, or assault in the dwelling, or a person who breaks and enters a dwelling or enters a dwelling without permission and, at any time while he or she is entering, present in, or exiting the dwelling, commits a felony, larceny, or assault is guilty of home invasion in the first degree if at any time while the person is entering, present in, or exiting the dwelling either of the following circumstances exists:

(a) The person is armed with a dangerous weapon.

(b) Another person is lawfully present in the building.

In this case, defendant does not dispute that he entered Huntoon's home on September 27, 2021, while Huntoon was lawfully present in the home. Defendant also does not dispute that while present in Huntoon's home, he took her cell phone without her permission. If taking her phone meets the elements of larceny, as discussed below, then the only element in dispute on the charge of first-degree home invasion at the time of trial was whether defendant entered Huntoon's home without permission.

Cousins testified that after she and defendant ended their relationship, she told defendant that he could retrieve his property from her garage; she testified that while he was doing so, he walked into her house without her permission. Similarly, Janae Woodward testified that in January

-13-

2007, three years after her relationship with defendant ended, defendant tried to enter her house while she was entertaining family and friends. This is the only portion of the testimony of the three witnesses that pertains to defendant's propensity to enter a dwelling without permission. Because the vast majority of the testimony of the three witnesses was unrelated to that issue, the bulk of testimony of the three witnesses was not relevant to the charge of first-degree home invasion, except to the extent that it related to larceny, as discussed next.

Defendant also was charged with larceny from a building, MCL 750.360, which provides, in pertinent part:

> Any person who shall commit the crime of larceny by stealing in any dwelling house . . . shall be guilty of a felony.

In Michigan, there is no statutory definition of larceny; courts look to the common law definition of simple larceny, which is distilled down to five elements, namely, (1) a trespassory taking and (2) carrying away, (3) of the personal property (4) of another (5) with the intent to steal that property. *People v March*, 499 Mich 389, 400-401; 886 NW2d 396 (2016). To prove larceny from a building under MCL 750.360, the prosecution must prove the five elements of larceny and also that the taking occurred within the confines of a building. *Id*. In this case, defendant does not dispute that he took Huntoon's phone without her permission from her home. Defendant only disputes that he had the intent to steal the phone; he testified that he took it by accident when he grabbed his clothes and fled Huntoon's house. Defendant's failure to return the phone for a year, however, casts doubt on his assertion that he took it accidentally, as does the testimony of Officer Orr that defendant told the Michigan State Police that he took the phone on purpose to embarrass Huntoon with the videos.

Cousins testified that during an argument, defendant took her phone from her, and that he previously had taken her phone and also had broken her previous phone. Rice testified that while they were in a relationship in December 2014, defendant stole money, tools, and Christmas gifts from her. Woodward testified that in July 2005, defendant took her phone and keys. This testimony arguably is relevant to defendant's propensity to take the phone of a girlfriend during or after a quarrel or a breakup, and also his propensity for theft in general.

To summarize, because defendant does not dispute the element of sexual penetration, the elements of CSC I were demonstrated if the prosecution proved that the sexual penetration occurred under circumstances involving the commission of one of the other charged felonies. At the time of trial, the only factual disputes on the charge of first-degree home invasion were whether defendant entered Huntoon's home without permission and whether he committed a larceny. The only factual dispute on the charge of larceny from a building was whether defendant intended to steal Huntoon's phone. Only a small portion of the testimony of the witnesses was relevant to these factual issues remaining at the time of trial.

As noted, the trial court in this case admitted the testimony of Cousins and Rice under MCL 768.27b, while admitting the testimony of Woodward, which related to an event more than 10 years before the charged conduct in this case, under MRE 404(b). As discussed, the only testimony that Woodward provided that was relevant was her testimony that in January 2007, three years after her relationship with defendant ended, defendant tried to enter her house where she was

entertaining family and friends, and her testimony that in July 2005, defendant took her phone and keys.

MRE 404(b) differs from MCL 768.27b in several ways relevant to the admission of evidence in a case alleging domestic violence, most prominently that MCL 768.27b permits evidence to be admitted to show a defendant's propensity or character, while MRE 404(b) does not. *Rosa*, 322 Mich App at 735. However, MRE 404(b) provides a nonexhaustive list of grounds other than propensity for which prior acts evidence may be admitted when material. One of these bases is when the evidence is proof of absence of mistake or accident.

In this case, defendant testified that he accidentally took Huntoon's phone. Woodward's testimony that he took her phone at the end of the relationship arguably fits within this exception. However, Woodward's testimony in this regard was unnecessary, and therefore had little probative value. Officer Orr testified that defendant admitted that he took Huntoon's phone on purpose to embarrass her by publishing the videos, which refuted defendant's testimony at trial that he took the phone accidentally.

The remaining question regarding the testimony of Cousins and Rice is whether the portion of their testimony that was admissible under MCL 768.27b, was precluded under MRE 403. As discussed, the only relevant testimony given by Cousins was her testimony that after she and defendant ended their relationship, she told defendant that he could retrieve his property from her garage, and while he was doing so, he walked into her house without her permission. Cousins also testified that during an argument, defendant took her phone from her, and he previously had taken her phone and also had broken her previous phone. Rice testified that while they were in a relationship in December 2014, defendant stole money, tools, and Christmas gifts.

Even if relevant, evidence otherwise admissible under MCL 768.27b may be excluded under MRE 403 if the danger of unfair prejudice substantially outweighs the probative value of the evidence. See *Head*, 323 Mich App at 541. As discussed, when considering whether MRE 403 should bar evidence admissible under MCL 768.27b, the court may consider "(1) the dissimilarity between the other acts and the charged crime, (2) the temporal proximity of the other acts to the charged crime, (3) the infrequency of the other acts, (4) the presence of intervening acts, (5) the lack of reliability of the evidence supporting the occurrence of the other acts, and (6) the lack of need for evidence beyond the complainant's and the defendant's testimony." *Watkins*, 491 Mich at 487-488.

In this case, Cousins' testimony that defendant tried to enter her home without permission while retrieving his belongings from the garage, and the testimony of Cousins and Rice that defendant stole their property, have some relevance to the charges of home invasion and larceny. The conduct in question happened between 2019 and January 2020 (Cousins) and 2014-2015 (Rice), and therefore was not distant in time from the charged conduct occurring in September 2021. Cousins and Rice testified about specific incidents, and did not testify that the acts were frequent behavior. Regarding reliability, there is no corroboration for the testimony of Cousins and Rice, although those witnesses seem credible upon review of their testimony. There was little need for the testimony, however. Defendant admitted that he took Huntoon's phone and Officer Orr testified that defendant admitted intentionally taking Huntoon's phone. Additionally, Cousins' testimony does not provide much, if any, support for the proposition that defendant knowingly

entered Huntoon's home without permission. However, weighing the testimony of Cousins and Rice in favor of probative value rather than prejudicial effect, we conclude that the limited portions of their testimony identified arguably were relevant and not overly prejudicial.

Aside from the limited portions of the testimony identified, the remaining testimony was not only irrelevant, but also highly prejudicial. The parties in this case agreed on most of the facts; the only factual issues in dispute at the time of trial were whether defendant had permission to enter Huntoon's home and whether he intended to steal Huntoon's phone or took it accidentally. The evidence in this case does not suggest that defendant and Huntoon were in an abusive relationship; in fact, the couple agrees that the night before the alleged offenses they had consensual sex, video recorded it, and spent the next day texting companionably, including talking about the video they had made the night before.

The testimony of Cousins, Rice, and Woodward introduce a very different picture of defendant. The vast majority of the testimony by Cousins, Rice, and Woodward involved their allegations that he was a violent and unreasonable partner who constantly accused them of infidelity, beat them, and threatened to shoot them. That evidence alone may have convinced the jury that defendant was guilty because he was a violent, abusive man, regardless of whether Huntoon gave him a key and invited him to her home where the couple agrees they had consensual sex the night before. Also, a review of the record suggests that both defendant and Huntoon were evasive in their testimony. By contrast, Cousins, Rice, and Woodward appear more credible than Huntoon and arguably lent credibility to Huntoon's testimony.

In addition, Cousins' testimony about an earlier fight with defendant in her garage and his request for marijuana at the home of his ex-wife in Cheboygan was both irrelevant and prejudicial. Defense counsel did not object until she had made these statements, and although the trial court sustained the objection and instructed the jury to disregard Cousins' testimony about the fight in the garage and the trip to Cheboygan, the trial court allowed the jury to keep any notes they had made of the testimony.

Defense counsel had ample opportunity to object to the anticipated testimony of Cousins, Rice, and Woodward before trial, but disregarded the deadline for objections imposed by the trial court, and waited until the afternoon before trial to file objections in a haphazard manner and without a supporting brief. We conclude that defense counsel's failure timely to object to the majority of the testimony of Cousins, Rice, and Woodward resulted in the admission of evidence that was both irrelevant and highly prejudicial. Clearly, this decision was not trial strategy, because defense counsel belatedly attempted to object to the testimony, but did so untimely and inadequately. The extent of the error by counsel in this case is ample enough to undermine confidence in the outcome of the lower court proceedings.

## 2. HOLLY ROSEN'S EXPERT TESTIMONY

Defendant argues that defense counsel was ineffective because he failed to object to the testimony of the prosecution's expert, Holly Rosen, which defendant argues was impermissible vouching. We agree that defense counsel was ineffective for failing to object to Rosen's testimony.

An expert witness may testify about the behavior of victims of sexual abuse generally "for the sole purpose of explaining a victim's specific behavior that might be incorrectly construed by the jury as inconsistent with that of an abuse victim or to rebut an attack on the victim's credibility." *People v Peterson*, 450 Mich 349, 373; 537 NW2d 857 (1995) (referring to victims of child sexual abuse). But an expert may not vouch for the veracity of the victim, *People v Dobek*, 274 Mich App 58, 71; 732 NW2d 546 (2007), nor testify that abuse actually occurred, *People v Garrison (On Remand)*, 187 Mich App 657, 658; 468 NW2d 321 (1991).

MRE 702 governs the admissibility of expert testimony, requiring the trial court as gatekeeper to ensure that each aspect of the proposed expert's testimony is both relevant and reliable. *People v Lemons*, 514 Mich 485, 504; 22 NW3d 42 (2024). At the time of trial, MRE 702 provided:[13]

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Thus, even when proposed expert testimony is offered by a qualified expert and based on reliable data and methods, the testimony may be excluded if it is not relevant to the facts of the case or is offered for a proposition that does not require the aid of expert interpretation. *People v Kowalski*, 492 Mich 106, 122; 821 NW2d 14 (2012).

Holly Rosen was qualified by the trial court to testify regarding nonintuitive victim responses, perpetrator tactics, domestic and sexual assault, and the neurobiology of trauma. She testified that one tactic that an abuser might use is to threaten suicide to keep the victim in the relationship, which Rosen categorized as emotional abuse. She also testified that abusers may take the victim's cell phone or car keys as a means to isolate the victim, which she testified was dangerous because it prevented the victim from contacting the police. Rosen also testified that some victims of sexual abuse experience tonic immobility, which she described as the victim being unable to move or speak while being sexually assaulted, and which she explained could prevent a victim from being able to resist an assailant. Rosen further testified that some victims of trauma, such as sexual assault, have fragmented memory or inconsistent memory, and therefore sometimes testify inconsistently.

We conclude that Rosen did not vouch for Huntoon; she did not testify that victims of sexual abuse do not lie nor that Huntoon herself was not lying. We conclude, however, that Rosen's testimony was neither relevant nor required for the jury to determine the facts in issue. Rosen testified about the characteristics of abusers, the inability of some victims to resist an assault, and the inability of some victims to consistently and accurately testify. These topics were largely irrelevant to the factual issues existing at the time of trial. Defendant and Huntoon agreed

---

[13] MRE 702 was amended September 20, 2023, effective January 1, 2024.

that at least two sexual penetrations occurred on the night in question, that defendant entered Huntoon's house on the night in question, and that defendant took Huntoon's phone when he left. The only factual issues remaining to be proved at the time of trial were whether defendant entered Huntoon's home without permission and whether defendant took Huntoon's phone intentionally.

Rosen testified that abusers threaten suicide and take their victim's cell phones. The prosecution apparently wanted to prove through Rosen's testimony that because defendant threatened suicide, broke Huntoon's phone the night before, then took her new phone, defendant is an abuser, and therefore the taking of the phone likely was intentional. But in this case, the lay testimony more directly demonstrates the taking of the phone without the need for expert testimony regarding the psychology of domestic abuse. Officer Orr testified that when defendant finally gave Huntoon's phone to the police, he admitted that he had taken the phone intentionally[14] to embarrass Huntoon by publishing the sexually explicit videos.

Rosen also testified that victims often do not defend themselves during an attack and make poor witnesses because their memories are obscured by trauma. But lack of consent to the sexual penetration is not an element to CSC I under the section charged by the prosecution, and therefore whether Huntoon resisted the sexual conduct was irrelevant. In addition, although there were some vagaries and evasions in Huntoon's testimony, she consistently testified that she did not invite defendant to her home that night, and defendant admitted that he let himself in.

Moreover, the issues of fact remaining at trial did not require expert analysis. At trial, the only issues of fact in dispute were whether defendant entered Huntoon's home without her permission and whether defendant intended to steal Huntoon's phone when he took it. Rosen's testimony pertained to why someone in Huntoon's situation would have failed to communicate lack of consent to sex with defendant under the circumstances of September 27, 2021, and then fail to consistently testify regarding the incident. Because those questions were not at issue, Rosen's testimony was neither relevant nor helpful. Defense counsel's failure to timely object to Rosen's testimony resulted in the admission of evidence that was both irrelevant and prejudicial.

### 3. WITNESS AND EXHIBIT LISTS

Defendant argues that defense counsel was ineffective because he failed to investigate the prosecution's case and failed to timely file a witness list and exhibit list. We agree.

The trial court entered a pretrial order on August 29, 2022, ordering the parties to exchange and file witness lists and exhibit lists in accordance with MCL 767.40a, MCL 767.94a, and MCR 6.201. MCL 767.94a(2) required defendant to file his witness list and exhibit list not later than 10 days before the start of trial. Under the statute, the failure to do so results in the defendant being precluded from offering that evidence at trial unless the trial court permits its introduction for good cause shown. MCL 767.94a(3).

---

[14] This remained an issue at trial, however, because defendant testified at trial that he took Huntoon's phone accidentally while hurriedly grabbing his clothes.

Defendant filed a witness list and an exhibit list on December 12, 2022, the day before trial. Defendant listed 27 witnesses, many of whom were unknown, such as the record keeper for defendant's and Huntoon's cell phone providers, and 27 exhibits with the exhibits only generally described. Regarding the witness and exhibits lists, the trial court stated:

> Under the Court's pre-trial order, defendant was required to file witness and exhibit lists at least 28 days before trial. Defendant did not do so. Defendant also did not seek leave of the Court before attempting to file his proposed witness and exhibit list[s]. The proposed witness list does not contain any information about who these witnesses are or how the prosecutor could contact them. The constitutional right to present a defense also includes a right to call witnesses, but the right is not absolute and must comply with the established rules of procedure.

> The sanction of precluding evidence [is] a severe one. The Court would normally only apply it in the most extreme of cases. Here however, there has been no formal request to file a late witness or exhibit list. And there has been no showing of good cause. The late submission by the defendant deprived the prosecutor of an ability to prepare for these witnesses. It also means that these witnesses were not disclosed to the Court as it prepared its opening jury instructions and witness lists for voir dire. Critically, the potential jurors were not questioned to determine if they know any of these proposed witnesses. Given the minimal effort by defense counsel to present [these] issues for the Court's consideration, any request to file a late witness or exhibit list is denied.

Defense counsel's failure to timely file the witness and exhibit lists precluded any possible introduction of evidence on defendant's behalf. In addition, the very general nature of the witness and exhibit lists filed suggest that on the eve of trial, defense counsel was still in the discovery stage, had not investigated the charges, was not prepared to call witnesses, and was not prepared to admit exhibits. The lack of preparation is evident in some of the cross-examination of witnesses at trial, as well as defense counsel's belated objecting to irrelevant and prejudicial testimony by Deanna Cousins. These actions by defense counsel cannot be considered sound trial strategy, but rather reflect a lack of preparation. The extent of the error by counsel in this case is ample enough to undermine confidence in the outcome of the lower court proceedings.

## 4. MISTAKE OF FACT

Defendant contends that defense counsel was ineffective because he failed to request a mistake of fact jury instruction. Defendant argues that he was entitled to an instruction of mistake of fact because there was evidence that he had an honest and reasonable belief that Huntoon had invited him to her home that night.

A defendant in a criminal prosecution is entitled to have the jury properly instructed. *People v Armstrong*, 305 Mich 230, 239; 851 NW2d 856 (2014). The jury instructions must include all elements of the charged crime, and must not exclude any defenses or theories if there is evidence to support them. *Id*. at 240. Mistake of fact is a defense if it negates the mental state required to prove the crime charged. The defense of mistake of fact requires a mistake relating to facts, not the law, and the mistake must be honest and reasonable. Am Jur 2d, Criminal Law §

148. "A mere belief, unsupported by a showing of due care and bona fide, reasonable effort to ascertain the facts, is insufficient to constitute a mistake of fact defense." *People v Quinn*, 440 Mich 178, 196; 487 NW2d 194 (1992). Because mistake of fact is simply a defense, not an affirmative defense, once put in issue the prosecution has the burden to negate the defense. Am Jur 2d, Criminal Law § 148.

In this case, one of the felonies on which the charge of CSC I was based is first-degree home invasion, an element of which is entering a home without permission. MCL 750.110a(1)(c) defines "without permission" as "without having obtained permission to enter from the owner or lessee of the dwelling or from any other person lawfully in possession or control of the dwelling." Here, defendant testified that he had permission to enter Huntoon's home because she invited him over during their phone conversation. Although Huntoon denied that she invited him to her home that night, she admitted that she spent many hours that day engaged in sexually provocative texting with defendant, that in the past she had permitted defendant to let himself into the house with a key, and that she had permitted defendant to come to her house the night before for the purpose of consensual sex. In addition, defendant had a key to Huntoon's house, which he gave to police a few days later, and which he testified he obtained from Huntoon the night before when she stated that he could let himself in "whenever." Defendant had more than a "mere belief" that he had permission to enter; his testimony, if believed, was that he in fact had been given permission to enter along with the key to do so.

We conclude that defense counsel at trial should have requested the mistake of fact instruction in order to zealously represent defendant. The outcome of this prosecution hinged almost entirely upon whether Huntoon gave defendant permission to enter her home on the night in question; Huntoon testified that she did not, while defendant testified that she did, and provided him with a key. Because the defense was supported by evidence, defendant was entitled to have the jury instructed on the defense. *Armstrong*, 305 Mich App at 239. It is not clear whether the outcome would have been different had defense counsel requested the instruction, but without the instruction the jury was left uninstructed on what was essentially defendant's only defense. We conclude that counsel was ineffective for failing to request the instruction.

B. EXCULPATORY EVIDENCE

Defendant contends that he is entitled to a new trial because the prosecution withheld exculpatory evidence in violation of *Brady*. Specifically, defendant argues that the prosecution withheld the record of the complete texting between defendant and Huntoon in the days leading up to the alleged assault, that the withheld messages are favorable to defendant, and that as a result of the evidence being withheld, defendant was prejudiced at trial.

Before the trial court, defendant moved for a new trial, or alternatively, an evidentiary hearing, and supported the motion with a brief, raising this issue, which therefore is preserved for review by this Court. See *People v Wilson*, 242 Mich App 350, 352; 619 NW2d 413 (2000). This Court reviews de novo a preserved constitutional claim, such as an alleged *Brady* violation. *People v Burger*, 331 Mich App 504, 516; 953 NW2d 424 (2020).

To establish a *Brady* violation, a defendant must demonstrate that (1) the prosecution suppressed evidence, (2) favorable to the defendant, (3) that is material. *People v Chenault*, 495

Mich 142, 150; 845 NW2d 731 (2014). With respect to the first element, the prosecution is responsible for evidence within its control regardless of whether the prosecution knows of the evidence, and regardless of whether the prosecution is acting in good or bad faith. With respect to the second element, evidence is considered favorable to the defendant when it is either exculpatory or impeaching. With respect to the third element, to establish materiality the defendant must show that there is a reasonable probability that if the evidence had been disclosed to the defense, the result of the proceeding would have been different; a reasonable probability is one that is sufficient to undermine confidence in the outcome of the proceeding. *Burger*, 331 Mich at 517.

In this case, defendant asserts that the prosecution failed to provide defendant with the full texting correspondence between defendant and Huntoon from August 22, 2021, through September 27, 2021, though police had obtained the messages from the defendant's cell phone. These messages are not part of the trial court record because they were obtained by appellate defense counsel after trial, and the trial court struck defendant's motion for new trial. After obtaining the full texting correspondence, appellate defense counsel attached the messages and an affidavit to defendant's motion for remand filed with this Court.

Defendant argues that the text messages could have been used to impeach Huntoon's credibility and that there is a reasonable probability that the outcome of the proceedings would have been different if the complete text messages had been disclosed to the defense before trial. Defendant is not specific, however, regarding which of the over 5000 text messages he is referring to, nor exactly how the messages would have been used to impeach Huntoon. The text messages reviewed indicate that defendant and Huntoon texted constantly after she told him to move out on August 22, 2021. During their texting conversations, they both declared their love for each other, blamed each other for the breakup, frequently talked in explicit terms about their sexual acts together in the past, and invited each other to participate in sex and to video record the sexual acts. Defendant, however, has not demonstrated that specific texts could be used to impeach Huntoon.

C. PROSECUTORIAL ERROR

Defendant contends that he was deprived of his constitutional right to a fair trial because the prosecutor during closing argument impermissibly appealed to the jury to do its civic duty, and also denigrated the defense. To preserve an issue of prosecutorial misconduct, the defendant must object contemporaneously and request a curative instruction. *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). Here, defendant objected to a statement by the prosecutor that mischaracterized the defense, but did not object to the prosecutor's statements that defendant now argues appealed to the jury to do its civic duty. The challenge to the mischaracterization is therefore preserved while the challenge to the "civic duty" argument is not preserved. This Court reviews preserved claims of prosecutorial misconduct de novo to determine whether the prosecutor's comments denied the defendant a fair trial, while unpreserved claims of prosecutorial error are reviewed for plain error affecting defendant's substantial rights. *People v Ackerman*, 257 Mich App 434, 448; 669 NW2d 818 (2003).

This Court evaluates claims of prosecutorial error in the context of the record. *Id*. at 272-273. During closing argument the prosecution typically is given great latitude and permitted to argue the evidence and the reasonable inferences of the evidence as it relates to the prosecution's

theory of the case. *People v Unger*, 278 Mich App 210, 236; 749 NW2d 272 (2008). But a defendant's right to a fair trial may be jeopardized if the prosecutor invites the jury to sympathize with the victim or to decide the case on the basis of civic duty. *People v Lane*, 308 Mich App 38, 66; 862 NW2d 446 (2014). In addition, the prosecution may not argue that the defense is intentionally trying to mislead the jury or denigrate the defense. See *People v Watson*, 245 Mich App 572, 592; 629 NW2d 411(2001); *Unger*, 278 Mich App at 236. In this case, during closing argument the prosecutor stated, in pertinent part:

> Defense counsel has tried to cast dirt on Melissa Huntoon and revictimize her in this case. . . . The defense has painted Melissa as being unworthy of justice.

At that point, defense counsel objected, arguing that the prosecution was mischaracterizing the defense. The trial court overruled the objection. On appeal, defendant argues that this statement by the prosecution improperly denigrated the defense. Defendant also argues that the prosecution denigrated the defense by stating that the victim had nothing to gain by the prosecution of the case "other than abuse by the defense." Although these statements by the prosecutor cast the defense in a poor light, they do not suggest that the defense was attempting to mislead the jury but rather that the defense was unsympathetic to Huntoon. These statements did not deny defendant a fair trial.

Defendant also points to statements made by the prosecutor that defendant argues urged the jury to do its civic duty by convicting defendant. The prosecutor argued:

> What Melissa deserves is your verdict that vindicates her, and if you cannot do so, trials like this become meaningless. So I ask that you return a verdict of guilty as charge[d].

A prosecutor may not urge the jury to convict a defendant as part of the jury's civic duty. *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995). Such an argument encourages the jury to consider issues beyond the evidence of the defendant's guilt or innocence. *People v Abraham*, 256 Mich App 265, 273; 662 NW2d 836 (2003). In this case, the statement by the prosecution that the trial was "meaningless" unless the jury convicted defendant and the suggestion that it was the jury's duty to vindicate Huntoon crossed the line from arguing the evidence to instructing the jury that its civic duty was to convict defendant.

Defendant did not object to this statement by the prosecution and therefore the trial court did not have an opportunity to give a curative instruction. In addition, the trial court instructed the jury as to its duty, and juries are presumed to follow their instructions. *Unger*, 278 Mich App at 235. We conclude that this comment alone did not affect defendant's substantial rights to the extent that the unpreserved claim involves error warranting reversal. However, we consider this issue when considering defendant's claim of cumulative error.

### D. CUMULATIVE ERROR

Defendant contends that the cumulative effect of the errors in this case combined to deprive him of his right to a fair trial as guaranteed under the state and federal constitutions. The cumulative effect of several errors can create prejudice sufficient to warrant reversal even if any

one of the errors alone would not merit reversal, but only if the cumulative effect of the errors undermines confidence in the reliability of the verdict. *Dobek*, 274 Mich App at 106. As discussed, defendant was denied the effective assistance of counsel and therefore is entitled to a new trial. The statement made by the prosecution during closing argument improperly appealed to the jury's civic duty and is an error that contributes to the cumulative error.

In addition, though not raised by defendant on appeal, an instructional error occurred that warrants reversal. Defendant was charged with two counts of CSC I under MCL 750.520b(1)(c). As discussed, a charge of CSC I under MCL 750.520b(1)(c) has only two elements, which are (1) sexual penetration (2) that occurs under circumstances involving the commission of another felony. See *Wilkens*, 267 Mich App at 736.

Before trial, defense counsel and the prosecution informed the trial court that they were stipulating to the jury instructions, subject to the attorneys finalizing the instructions after the proofs were presented. The trial court then gave the jury preliminary instructions before opening statements. When instructing the jury regarding the two charges of first-degree CSC under MCL 750.520b(109c), the trial court stated in relevant part:

> In count one, the defendant is charged with first-degree criminal sexual conduct. To prove this charge, the prosecutor must prove each of the following elements beyond a reasonable doubt:
>
> First, that the defendant engaged in the sexual act that involved touching of Melissa Huntoon's genital organs with the defendant's mouth or tongue.
>
> Second, Melissa Huntoon was physically helpless at the time of the alleged act. Physically helpless means that Melissa Huntoon was unconscious, asleep, or physically incapable to communicate that she did not want to take part in the alleged act **or**, second that the alleged sexual act occurred under circumstances that also involved first-degree home invasion or larceny in a building. I'll explain the elements of those charges later.

The trial court then gave a similar instruction for the second count of CSC I, again stating that the prosecution was required to prove *either* that the victim was physically helpless *or* that the sexual penetration occurred during the commission of a felony.

After closing arguments, the trial court again instructed the jury regarding the elements of CSC I under MCL 750.520b(1)(c). The trial court again instructed that to prove CSC I the prosecution was required to prove (1) sexual penetration and, (2) *alternatively*, that Huntoon was physically helpless at the time of the sexual penetration, *or* that the penetration occurred during the commission of either first-degree home invasion or larceny from a building. The trial court's instruction suggests that the prosecution was proceeding under alternative theories of CSC I, being the theory as charged under MCL 750.520b(1)(c), which requires proof of (1) penetration, (2) that occurs under circumstances involving the commission of another felony, and also under some other theory that involves (1) penetration (2) that occurs when the victim is physically helpless.

-23-

Under MCL 750.520b, the statute prohibiting CSC I, there is not a provision for the prosecution to prove CSC I by proving (1) sexual penetration and (2) a physically helpless victim. It is unclear to what statutory section the trial court was referring; the element of a physically helpless victim as an element of CSC I appears under MCL 750.520b(1)(g) and (h), but the other elements necessary to prove CSC I under those sections are not applicable in this case. Those elements, however, would demonstrate third-degree criminal sexual conduct under MCL 750.520d(1)(c), but that offense was not charged, nor was it included on the jury verdict form. Given the instructions and the verdict form, it is possible that some or all of the jurors in this case found that defendant engaged in sexual penetration with Huntoon while she was physically helpless, which would constitute CSC III, but not CSC I.

"Jury instructions must include all elements of the charged offenses and any material issues, defenses, and theories if there is evidence to support them." *People v Czuprynski*, 325 Mich App 449, 456; 926 NW2d 282 (2018). In this case, there was evidence sufficient to support an instruction of first-degree CSC under MCL 750.520b(1)(c) on the theory that defendant engaged in penetration with Huntoon under circumstances involving the commission of another felony. There also was evidence sufficient to support an instruction that defendant engaged in penetration with Huntoon while she was physically helpless. That theory, however, involves CSC III, not CSC I. From the verdict form, it is not possible to know under which theory the jury convicted defendant. We further conclude that defense trial counsel was ineffective when stipulating to this instruction. The result of the cumulative error undermines this Court's confidence in the reliability in the jury's verdict.

## E. BEST EVIDENCE RULE

In his Standard 4 Brief, defendant contends that the trial court violated his right to a fair trial when it circumvented the best evidence rule by permitting the prosecution to introduce the transcript of a custodial interview by having two people role play the interview from an unauthenticated transcript rather than producing the original audio recording of the interview for the jury. We disagree.

We note initially that defendant's challenge to the admission of the transcript of the custodial interrogation on the basis of the best evidence rule was raised before the trial court and therefore is preserved. See *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019). Any challenge to the accuracy of the transcript, however, was waived by defense counsel at trial. See *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000) (Waiver extinguishes any error and bars a challenge on appeal of claimed deprivation of rights).

This Court reviews a preserved evidentiary challenge for an abuse of the trial court's discretion. *People v Duncan*, 494 Mich 713, 722; 835 NW2d 399 (2013). The trial court abuses its discretion when its decision falls outside the range of principled outcomes. *Id*. This Court reviews de novo a question of law underlying the admission of evidence, such as whether a rule of evidence bars the admission of the evidence. *Id*. at 723.

At trial, Officer Orr testified that he interviewed defendant on September 29, 2021, that the interview was audio recorded, and that the audio recording had been transcribed. Defense counsel agreed on the record that the transcription presented at trial matched the audio recording.

However, defense counsel at trial objected to the introduction of the transcript, arguing that the audio recording was the best evidence. The prosecution agreed to play the audio recording. The trial court directed that the audio recording be played while the jury also followed along with the written transcript to address the poor acoustics in the court room; defense counsel agreed to this process without further objection.

Upon further discussion, however, the trial court learned that the audio recording contained reference to a personal protection order which the trial court had ruled was not admissible, and which the trial court earlier had directed the prosecution to redact from the audio recording. The trial court determined that the audio recording therefore could not be played for the jury and ordered that instead the transcript be read to the jury by two people role playing the interview. The trial court found that only minimal prejudice to defendant would result from not playing the audio recording. Defense counsel then reasserted his objection that the transcript was not the best evidence.

At the time of trial in this case, the best evidence rule provided that "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by statute." MRE 1002.[15] The purpose of the best evidence rule is to guard against fraud and inaccuracy. Absent the original source, a witness may be mistaken or be tempted to lie about the contents of an original source. In light of that purpose, "[t]he best evidence rule only applies when the contents of a writing are in issue." *People v Tucker*, 504 Mich 934, 936 (CLEMENT, J. dissenting), quoting *People v Alexander*, 112 Mich App 74, 76; 314 NW2d 801 (1981). The rule therefore should not be invoked if the contents of the evidence is not disputed. See *People v Leuth*, 253 Mich App 670, 686; 660 NW2d 322 (2002).

Defendant argues that the accuracy of the transcript was not verified, and that the prosecutor's failure to redact the audio recording as directed by the trial court caused the audio recording to be unavailable to be played at trial. The trial court, however, inquired at trial whether defense counsel had compared the transcript to the audio recording and was satisfied with the accuracy of the transcript, and defense counsel indicated that he was and thereby waived a challenge on appeal to the accuracy of the transcription. Moreover, because defense counsel agreed to the accuracy of the transcript, the best evidence rule cannot be invoked. See *Leuth*, 253 Mich App at 686.

Defendant also argues that the process of introducing the transcript via role playing may have introduced emotion or tone into the evidence that would not have been conveyed by the audio recording. However, only a challenge to the accuracy of the transcript qualifies as a proper challenge under the best evidence rule. Moreover, defendant does not assert that any prejudice occurred from the reading of the transcript, only that it was possible for prejudice to occur. A judgment is not to be set aside or reversed on the basis of the improper admission of evidence unless, after examining the entire cause, "it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice." MCL 769.26. With regard to defendant's challenge under

---

[15] MRE 1002 was amended September 20, 2023, effective January 1, 2024.

the best evidence rule, defendant has not established a meritorious challenge or a miscarriage of justice.

We vacate defendant's convictions and sentences[16] in this case and remand to the trial court for a new trial. We do not retain jurisdiction.

/s/ Michael F. Gadola
/s/ Mark T. Boonstra
/s/ Brock A. Swartzle

---

[16] Because we vacate defendant's convictions and sentences and remand for a new trial, we decline to reach defendant's challenge to the reasonableness of his sentences.